Filed 2/24/23  P. v. Deltoro CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H048311 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1893392) |
| v. | |
| GUSTAVO TORRES DELTORO, | |
| Defendant and Appellant. | |

The prosecution charged defendant Gustavo Torres Deltoro with one count of oral copulation with a child and five counts of lewd acts on a child by force or duress.  The prosecution presented the testimony of two complaining witnesses: A.D. and C.D., who were young girls at the time of the offenses in 2005 to 2009.

At trial, the prosecution's case-in-chief was interrupted in March 2020 by the onset of the COVID-19 pandemic, resulting in a pause of more than three months.  After the trial resumed, the jury found Deltoro guilty on all counts and found true a multiple-victim enhancement.  The trial court imposed a total term of 90 years to life in prison.

Deltoro raises numerous claims on appeal.  First, he contends the trial court erred in denying his motions for a mistrial based on the COVID-19-related delay in the trial.  Second, he contends the trial court erred in excluding evidence that A.D. had been molested by another cousin.  Third, he contends the trial court committed misconduct during voir dire in jury selection by improperly commenting on the case.  Fourth, he

contends the trial court gave an erroneous jury instruction on unanimity regarding the four counts pertaining to C.D. Fifth, he contends the prosecutor committed misconduct in closing argument by urging the jury to misuse expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS).

Additionally, we requested supplemental briefing from the parties on the significance, if any, of three additional issues. First, the verdict forms for five counts erroneously stated that the lesser included offense of a lewd act on a child was a misdemeanor. Second, at the conclusion of C.D.'s testimony, the trial court made a comment in the presence of the jury in which the court described C.D.'s demeanor on the stand as "traumatized." Third, we asked whether any asserted errors resulted in cumulative prejudice.

For the reasons below, we conclude multiple errors occurred during trial. While no single error was so prejudicial as to require reversal, we conclude the cumulative prejudice from at least three of these errors requires us to reverse the judgment in its entirety.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

The prosecution charged Deltoro with six counts: count 1—oral copulation with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b))[2]; and counts 2 through 6—lewd or lascivious acts on a child by force, violence, or duress (§ 288, subd. (b)(1)). As to counts 2 through 6, the information further alleged Deltoro committed the offenses against more than one victim. (§ 667.61, subds. (b) & (e).)

---

[1] Deltoro further contends we should order the trial court to strike a criminal justice administration fee based on the recent enactment of Assembly Bill No. 1869. Because we are reversing the judgment, we do not reach this claim.

[2] Subsequent undesignated statutory references are to the Penal Code.

2

The case proceeded to trial in March 2020. After the prosecution presented testimony from its first witness, the trial court paused proceedings due to the increasing severity of the COVID-19 pandemic. After the court denied multiple motions for a mistrial by Deltoro, testimony resumed in June 2020.

The jury found Deltoro guilty on all counts as charged and found true the multiple-victims enhancement. The trial court imposed an aggregate term of 90 years to life in prison, consisting of six consecutive terms of 15 years to life.

## B. Facts of the Offenses

Deltoro was married to Marcella, who had two sisters—Isaura Doe and Andrea Doe—each of whom had daughters. Isaura's daughter C.D. was born in 2000, and Andrea's daughter A.D. was born in 2002. The prosecution alleged Deltoro molested C.D. on multiple occasions and A.D. on one occasion. At the times of the offenses, C.D. was six to eight years old, and her cousin A.D. was about five years old.

### 1. A.D.'s Allegations (Counts 1 and 2)

A.D. was 17 years old when she testified at trial. She testified that when she was in elementary school, her parents would drop her off at Deltoro's and Marcella's house in the morning before school and pick her up after school in the afternoon.

Once when A.D. was in kindergarten, she was watching television in Deltoro's living room, and he called her into his bedroom. They were the only ones at home at the time. When A.D. walked into the bedroom, she saw Deltoro standing behind the door. A.D. could not remember exactly what preceded it, but Deltoro unzipped his pants and took out his penis. A.D. could not remember if he said anything. She was standing in front of him, and he put his hand on the back of her head in a way that made A.D. think he wanted her to put his penis in her mouth. A.D. did not react to him, but "[h]is penis went into my mouth." Neither of them said anything, but she remembered him grunting or moaning. His penis was not erect when he first took it out, but it became erect once it was in her mouth. She tried to pull away, but he kept his hand on her head and prevented

3

her from doing so. She had her hands down by her side. She could not remember how long this went on, but his penis was in her mouth for longer than five seconds.

A.D. initially testified that she could not recall if she touched him with her hands at any time during this incident, but she then testified that she touched his penis with her hand. She testified that she remembered stroking his penis with her hand, and that Deltoro told her to do this. When asked at what point in the incident this happened, she responded, "I think before I put my mouth." (*Sic.*) She estimated she was in the bedroom for five minutes. She could not recall any other time when Deltoro touched her inappropriately.

A.D. testified that she did not tell anybody about the incident at the time because "it didn't feel real" and she tried to forget about it. When she was in the fifth grade, she "just kind of brought it up casually" with her father while they were driving to school. He tried to ask her questions about it, but she brushed them off and tried to change the subject because she felt embarrassed to talk about it. She was also concerned the family would break up if her parents found out. Her father tried to bring it up again later, but she brushed it off again. When she was in the eighth grade, A.D. told a group of three other girls about it. A.D. believed they understood they should not tell anyone else. In 2016, when she was a freshman, she told another friend about it and asked the friend not to divulge it.

In 2018, A.D. told a high school counselor about the incident with Deltoro. At that time, her parents were still unaware of the incident, and A.D. was scared to talk about it. She did not want it to be reported to the police, but the counselor was required to report it. The police then began investigating A.D.'s allegations.

### 2. C.D.'s Allegations (Counts 3 through 6)

C.D. was 20 years old when she testified at trial. She testified that she attended an elementary school near Deltoro's and Marcella's home from around 2005 to 2009, when she was between four and eight years old. Her parents were working, so during the week

4

she would stay at Deltoro's home before and after school. She testified that Deltoro committed multiple acts of sexual assault against her during this period.

The first incident C.D. could recall happened in a tool shed in Deltoro's backyard. During a game of hide-and-seek with her cousins, C.D. hid in the tool shed. Deltoro entered the shed, bent her over something, and rubbed his pelvic area on her buttocks with his hands on her hips. C.D. felt helpless and scared, and she did not say anything. Her shirt went up a little bit, but she could not remember if any of her clothing was removed. She could not remember if his penis made contact with her buttocks. When one of her cousins tried to find her, he quickly pulled her shirt down and left. C.D. vividly remembered the smell of wood because she was trying to focus on that smell to avoid thinking about what was happening.

The next incident occurred in C.D.'s home when Deltoro was there to help her parents put in a new bedroom set. C.D. was in her bedroom when Deltoro bent her over her bed, grabbed her hips, and rubbed his front pelvic area against her buttocks. Her parents were downstairs at the time. She felt scared and didn't want her parents to know because she was afraid she would get in trouble. C.D. remembered that she was wearing her favorite teal nightgown during this incident. She stopped wearing nightgowns afterwards.

On a third occasion, C.D. wasn't feeling good at school, so she left early and went to Deltoro's home. In the living room, there was a VCR machine in the shape of a car, and C.D. wanted to watch a movie, so she used the machine to rewind a videotape. While C.D. was bent over to use the machine, Deltoro came up behind her, grabbed her hips, and started grinding his pelvis against her buttocks. C.D. recalled that she was wearing a black and white polka-dot shirt at the time She could not recall anything being said. She was scared and froze.

C.D. recalled a fourth incident that took place in the same living room. Her memory of this incident was "a little more fuzzy" and not as detailed or vivid as her

5

memories of the other incidents. The room had leather couches, and she recalled being bent over an arm of the couch while Deltoro performed the same kind of movement— grabbing her hips and rubbing his front pelvis against her buttocks. This time, Deltoro grabbed her hand and tried to make her touch his penis. Only her palm touched his penis because she did not want to wrap her fingers around it. C.D. added that there were other times when Deltoro had his penis out. She could not remember how many times it happened, but it was more than once.

C.D. described a fifth incident that took place at Deltoro's house in her cousin's bedroom (Deltoro's daughter's bedroom). C.D. liked to read in her cousin's bedroom because it had a bookcase filled with books. On one occasion when C.D. was reading alone in the bedroom, Deltoro came in, bent her over the bed, put his hands on her hips, and thrusted his groin against her buttocks as he had done before. He told C.D. to read aloud to him while this was happening. C.D. initially testified that she did not remember her hand touching Deltoro's penis on this occasion. She later testified that he grabbed her hand and made her touch his penis during this incident.

Finally, C.D. recalled a sixth incident in Deltoro's bedroom. His bedroom contained an old white bedroom set that had been moved from C.D.'s parents' bedroom. While she was in the room, Deltoro bent her over the bed, put his hands on her hips, and did the same thing had done before.

C.D.'s best friend from school testified that when they were in the fourth grade, she went to C.D.'s house to play on one occasion but C.D. looked sad and wanted to talk about something. C.D. appeared hesitant and worried, but they had a long conversation in which C.D. said something sexual had happened between her and her uncle. C.D. asked her friend not to tell anyone about it.

Around 2011 or 2012, C.D. told her mother Isaura that something had happened between her (C.D.) and Deltoro, but C.D. did not go into detail. C.D. asked her mother not to tell Marcella, but Isaura confronted Marcella anyway. Isaura and Marcella

6

subsequently stopped visiting each other with their families. Isaura did not contact the police, however.

In 2015, C.D. told her high school counselor that something sexual had happened between her and her uncle when she was a child. Because the counselor was a mandated reporter, she called the police and Child Protective Services. Although the police investigated the allegations, the investigation was dropped and no charges were filed at that time. C.D.'s father testified that he did not want charges filed because he believed it would destroy the family.

When the police began investigating A.D.'s allegations in 2018, they became aware of the prior 2015 investigation concerning C.D. and followed up on her allegations.

### 3. *Expert Testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS)*

The prosecution presented clinical psychologist Dr. Blake Carmichael to provide expert testimony on CSAAS. Dr. Carmichael explained the concept of CSAAS and testified that it is not a diagnosis, test, or checklist used to determine whether a child has been sexually abused. He presented it as an educational framework designed to dispel myths and understand why certain behaviors may be present in a child who has been abused. He did not testify concerning the facts of this case or apply CSAAS to the complaining witnesses. He had no information about the case.

Dr. Carmichael testified that CSAAS has five categories or components: secrecy; helplessness; entrapment or accommodation; delayed or unconvincing and inconsistent disclosure; and retraction or recanting. Dr. Carmichael described each of the five components in detail. He testified that not all abused children exhibit all five of these behaviors.

### 4. *Defense Evidence*

Deltoro testified in his defense. He was 56 years old at the time of trial. He had been married for 26 years and had three children. He worked in landscaping at the

7

relevant times and used the shed in his yard to store tools. Deltoro testified that his wife had taken care of C.D. and A.D. at his house, but she stopped doing so at some point because Deltoro felt their parents were leaving them there for too long and taking advantage of his wife.

Deltoro categorically denied any sexual contact had occurred between him and the two girls. He denied that he ever asked A.D. to put her hand on his penis or that she put her mouth on it. He specifically denied each instance in which C.D. alleged he rubbed his penis against her. He testified that his only physical contact with the girls consisted of non-sexual contact such as high-fiving, touching on the shoulder, or patting on the head or back in a non-aggressive way. He denied that he was ever alone in a room with either C.D. or A.D., or that that he was alone with C.D. in the shed.

Deltoro's brother also testified for the defense. He testified that he went to C.D.'s house with Deltoro to move the bedroom furniture into the house. C.D. was present, as were her parents. He never saw Deltoro go into a room alone when they were moving the furniture, and he never saw anything unusual happen. He was there for about an hour, and Deltoro never left his sight.

## II. DISCUSSION

### A. Denial of Motions for a Mistrial Based on the COVID-19 Delay

As detailed below, the onset of the COVID-19 pandemic resulted in mid-trial delay of more than three months after the prosecution introduced the testimony of its first witness. Deltoro moved for mistrials both before and after the delay, and the trial court denied both motions. Deltoro contends the denial of his motions for mistrial violated his rights to due process and a fair trial. The Attorney General argues the trial court did not abuse its discretion in denying the motions.

### 1. Procedural Background

On March 12, 2020, the trial court empaneled a jury, the parties gave opening statements, and the prosecution called its first witness—C.D. The next day (Friday) was

8

a dark day for the court, and the trial resumed the following Monday, March 16. Deltoro filed a written motion for a mistrial on grounds of legal necessity due to the COVID-19 emergency. Deltoro offered to "stipulate to jeopardy, that we can retry this." Deltoro also requested, in the alternative, that the trial court question jurors regarding their ability to return after a two-week suspension for "what is essentially a quarantine period." The trial court summarily denied the motion for a mistrial but agreed that it would address the jurors.

C.D. continued to testify for the prosecution under direct examination, and the parties completed their cross-examination and redirect examination of C.D. subject to recall. The County of Santa Clara, meanwhile, had made known that an emergency order to shelter-in-place was imminent. Deltoro renewed his motion for a mistrial, citing the county's pending order to shelter in place, and Deltoro waived his right to assert "once in jeopardy." The trial court, however, denied the motion again. The court found there was no good cause for a mistrial, but added that Deltoro could bring the motion again if it was not possible to finish the trial with all 12 jurors in May. The court recessed and instructed jurors to go home until further notice, which the court estimated would be provided in three weeks.

On June 8, 2020, Deltoro filed another written motion for a mistrial, but the court did not immediately rule on it.

The jurors returned on June 22. The trial court individually questioned each sitting and alternate juror, asking whether they had been exposed to any information that might affect their ability to be fair, and whether they had followed the court's order not to make up their minds about the case. The court also inquired about potential hardships and excused two jurors based on their circumstances.

The trial court then denied Deltoro's motion again, and the evidentiary portion of the trial resumed. The court allowed counsel for both sides to give another round of "opening statements" based on what counsel believed the evidence would show, but not

9

including the evidence that had already been introduced.  On June 23, the prosecution recalled C.D. and questioned her under redirect, after which the defense recross-examined her.  The remainder of the trial followed, and the jury rendered its verdict on June 30.

Also on June 30, the trial court issued a written order setting forth the grounds for its ruling denying the motions for a mistrial.  The order relied in part on the then-recent opinion in *Stanley v. Superior Court of Contra Costa County* (2020) 50 Cal.App.5th 164 (*Stanley*) [holding the COVID-19 pandemic constituted good cause for a 90-day continuance that delayed a criminal trial beyond the usual time allowed under statutory and constitutional speedy trial rights].  The trial court then described in detail the circumstances underlying the state's emergency orders and the various measures implemented to ensure the health and safety of jurors, court personnel, and all other attendees.  The trial court concluded the preceding suspension of the trial was supported both by good cause and by agreement of Deltoro, who had requested a suspension of trial as an alternative to a mistrial.

### 2. *Legal Principles*

"Both the federal and state Constitutions guarantee criminal defendants the right to trial before an impartial jury."  (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 906.)  " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.  [Citation.]' [Citation.]  A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' [Citation.]"  (*People v. Collins* (2010) 49 Cal.4th 175, 198-199.)  "[W]e use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial."  (*People v. Bolden* (2002) 29 Cal.4th 515, 555.)

10

"In all cases where a jury is discharged or prevented from giving a verdict by reason of an accident or other cause, except where the defendant is discharged during the progress of the trial, or after the cause is submitted to them, the cause may be again tried." (§ 1141.) "Implicit in this provision is recognition of the fact that circumstances may arise due to the fault of no one—characterized as 'accident or other cause'— precluding the jury from rendering a verdict." (*People v. Manson* (1976) 61 Cal.App.3d 102, 202.) "Because a trial judge's determination to not grant a mistrial is a discretionary matter, it is not lightly tampered with. We note, however, that statutory and case law authority authorize the granting of a mistrial on the ground of 'legal necessity.' [Citation.] 'Legal necessity' may arise when there is a death, protracted illness, or other unavoidable absence of a judge or juror. [Citation.]" (*Ibid.*) We consider, as part of this analysis, whether the trial court had good cause for the mid-trial delay. "[I]t is necessary to examine if the trial court's denial of [a defendant's] mistrial motion and grant of a continuance struck the proper balance of protecting [the defendant's] constitutional rights and the jurors' health, and preserving judicial resources." (*People v. Breceda* (2022) 76 Cal.App.5th 71, 90 (*Breceda*).)

### 3. *The Denial of Deltoro's Motions for Mistrial Was Not Prejudicial Error*

The Attorney General contends this claim fails because the COVID-19 emergency constituted good cause for the delay and Deltoro was not prejudiced by it. We agree with the court in *Stanley* that the pandemic constituted good cause. "Under these circumstances, the trial court unquestionably was justified in finding that the COVID-19 pandemic constitutes good cause to continue defendant's trial [. . . ]. Given the grave risks to court personnel, jurors, attorneys, and defendant himself that would be created by proceeding in accordance with the normal timeline, any other conclusion would have been unreasonable in the extreme. While we acknowledge the unfortunate hardship to defendant from this delay, neither the prosecution nor the court is responsible for the emergency that has overwhelmed the nation and much of the world, and at this time,

11

'[p]ublic health concerns trump the right to a speedy trial.' [Citation.]" (*Stanley*, *supra*, 50 Cal.App.5th at p. 170.)

Deltoro does not challenge this point. Rather, he contends "the focus should be on the effect of the delay, not the justification for the delay." But as the Attorney General points out, Deltoro has not explained how he was prejudiced by the delay. Deltoro concedes that in response to the trial court's post-delay questioning, all the jurors confirmed they adhered to the instructions to avoid exposure to information about the case, and that the pandemic would have no adverse impact on their ability to function as effective, impartial jurors. Deltoro points to nothing in the record to show the jurors failed to do so.

Deltoro argues instead that jurors' memories of the evidence may have been adversely affected by the delay. (See *People v. Santamaria* (1991) 229 Cal.App.3d 269, 278 (*Santamaria*) [jurors' recollections of the evidence, the arguments, and the court's instructions may become dulled or confused during delay in trial].) But the pre-delay evidence in this case—the testimony of a single witness—was limited and not complex, and the prosecution recalled her to testify again after the delay. The jury also had the transcript of her pre-delay testimony available to them.

Deltoro argues the delay was so lengthy that there was an inherently high probability of prejudice—i.e., that it constituted structural error, such that he should not have to show prejudice. He acknowledges that the weight of authority from both California and federal courts requires some showing of prejudice. (See *People v. Gray* (2005) 37 Cal.4th 168, 233 [delay between guilt and penalty phases of capital trial did not constitute structural error]; *Breceda*, *supra*, 76 Cal.App.5th at p. 95 [rejecting assertion that risk of prejudice was inherently high enough to require reversal without express showing of prejudice]; *U.S. v. Smith* (4th Cir. 1995) 44 F.3d 1259, 1268 [no actual prejudice shown from 32-day hiatus].) He cites two cases, however, for the proposition that no showing of prejudice is required.

12

In *Santamaria*, *supra*, 229 Cal.App.3d 269, the trial court adjourned trial for 11 days in the middle of jury deliberations due to the judge's absence. The Court of Appeal held that the trial court had no good cause for the adjournment and reversed the conviction based on inherent prejudice to the defendant without any showing of actual prejudice. (*Id.* at pp. 280-281.) Deltoro also relies on *People v. Engleman* (1981) 116 Cal.App.3d Supp. 14 (*Engleman*), in which the appellate department of a superior court concluded an improper grant of a continuance was "inherently prejudicial" and compelled reversal. We find those cases unpersuasive. In both *Santamaria* and *Engleman*, the trial courts had no good cause for the delay, whereas it is undisputed that the trial court here had such cause. Deltoro also cites a federal appellate court opinion, but the holdings of federal courts are merely persuasive and not binding authority for this court. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1292.)

We are persuaded instead by the reasoning of *Breceda*, which concerned a 73-day mid-trial pause during the prosecution's case-in-chief due to the COVID-19 pandemic. The defendant appealed after the trial court denied his motion for a mistrial presented on grounds similar to those presented here. Except for the precise length of the delay, the procedural circumstances of that case were similar to those in this case. The Court of Appeal held that even assuming the trial court erred, such an error would require a harmless error analysis under the standard of *California v. Chapman* (1967) 386 U.S. 18, 24 (*Chapman*) [whether the error was harmless beyond a reasonable doubt].) (*Breceda*, *supra*, 76 Cal.App.5th at p. 98.) The Court of Appeal concluded that any error was harmless under that standard. "Before the pause in proceedings, the trial court admonished the jury to not form any opinions about the evidence, discuss the case or the evidence, conduct any independent research, or read or listen to any news reports about the case. When jurors returned, the court inquired of them whether they had obeyed the court's orders and the record demonstrates they had, except the one instance where a juror told his wife and employer he had to return to jury service because he was on a

13

murder case. It is pure speculation to conclude that during the recess jurors decided the case in the prosecution's favor or were influenced by outside sources. We presume jurors follow the trial court's instructions." (*Id.* at p. 99.)

The reasoning cited in *Breceda* applies with equal, if not greater, force here, as the pre-delay evidence presented by the prosecution in *Breceda* was substantially more voluminous. The trial court here admonished jurors in the same fashion as the court in *Breceda* did, and all jurors reported they were neither exposed to outside information about the case nor had they formed opinions about the case. We perceive no actual prejudice in the record. Deltoro argues *Breceda* was incorrectly decided, and he sets forth various sources of possible harm, but all these asserted harms are speculative. Thus, even assuming the trial court erred, we conclude this claim is without merit.

### B. Exclusion of Evidence That A.D. Had Been Molested by Her Cousin

Deltoro contends the trial court abused its discretion and violated his right to present a defense by excluding evidence that A.D. had been sexually molested by her cousin Joel (Deltoro's son). The Attorney General contends the trial court properly exercised its discretion to exclude the evidence because it was irrelevant or marginally relevant and it had the potential to confuse or prejudice the jury.

#### 1. Background

Deltoro moved in limine for the right to question A.D. about statements she had made indicating Deltoro's son Joel had molested her. Deltoro's proffer included an affidavit by counsel based on police reports and interviews stating that A.D. had disclosed Joel sexually assaulted her multiple times around 2011 when she was nine years old and he was 14. Counsel asserted that A.D. told her father about it in 2011 around the time it happened. The prosecution objected to the admission of testimony about the assaults. Deltoro argued the evidence was relevant to his defense on the theory that A.D. had falsely made the allegations against him (Deltoro) because she felt her allegations against Joel were not being taken seriously and she wanted to bolster the

14

credibility of her allegations against Joel. The trial court ruled the evidence of assaults by Joel was inadmissible. The trial court found there was no evidence that A.D. ever said or felt that her father did not believe her allegations concerning Joel, and the trial court found the two sets of allegations were too distant to conclude there was any nexus between them.

Deltoro subsequently renewed his request to introduce this evidence on the grounds that the prosecution "opened the door" to it. As set forth above in section I.B.1, A.D. disclosed being sexually molested to a group of friends, one of whom was her friend Jordan. Jordan testified for the prosecution as a "fresh complaint" witness about the disclosure. The prosecutor asked Jordan whether A.D. disclosed "something that happened between her and her uncle when she was younger," and Jordan answered, "Yes." The trial court then instructed the jury that this testimony was only being admitted for the purpose of showing that the disclosure was made, not for the truth of the assertion made in the disclosure: "[T]he content of that conversation is not for the truth of the matter asserted. It's only that the person made such a statement to another, which can either corroborate that it happened or not corroborate that it happened." Without going into the substance of what A.D. said, Jordan then testified that A.D. was crying and appeared emotionally distraught when she disclosed she had been molested.

At a sidebar conference, counsel for Deltoro argued that this opened the door to questions about Joel's abuse because A.D. had told Jordan about Joel's abuse as well as Deltoro's abuse. Counsel argued that she should be able to ask Jordan whether there was another reason why A.D. was distraught besides the allegation that Deltoro had molested her. The trial court rejected this argument on the ground that it would not be possible to determine whether one source of abuse or the other was responsible for her emotional display. Accordingly, the court denied defense counsel's request as irrelevant and calling for speculation by Jordan. Counsel for Deltoro objected that the trial court was

15

preventing her from presenting a full defense.  The trial court did not expressly address this objection but continued to exclude questions about allegations of abuse by Joel.

### 2.  *Legal Principles*

"No evidence is admissible except relevant evidence."  (Evid. Code, § 350.) "Evidence leading only to speculative inferences is irrelevant."  (*People v. Kraft* (2000) 23 Cal.4th 978, 1035.)  Evidence Code section 352 gives trial courts discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  "Rulings under Evidence Code section 352 come within the trial court's broad discretion and will not be overturned on appeal absent a showing of an abuse of that discretion."  (*People v. Brooks* (2017) 3 Cal.5th 1, 43.)

"[E]vidence of the fact and circumstances of a victim's complaint may be relevant for a variety of nonhearsay purposes, regardless whether the complaint is prompt or delayed."  (*People v. Brown* (1994) 8 Cal.4th 746, 761.)  "So long as the evidence that is admitted is carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an impermissible hearsay purpose, admission of such relevant evidence should assist in enlightening the jury without improperly prejudicing the defendant."  (*Id.* at p. 762.)  "[I]n light of the narrow purpose of its admission, evidence of the victim's report or disclosure of the alleged offense should be limited to the fact of the making of the complaint and other circumstances material to this limited purpose."  (*Id.* at p. 763.)

### 3.  *Excluding Evidence of Joel's Alleged Abuse Was Not an Abuse of Discretion*

Deltoro does not contest the trial court's initial pretrial ruling excluding evidence of allegations that Joel abused A.D.  Rather, he challenges only the trial court's ruling during Jordan's fresh complaint testimony when trial counsel asserted the prosecution

16

had "opened the door" to such evidence. Deltoro argues that because the jury only heard that A.D.'s disclosure to Jordan pertained to the allegation of abuse by Deltoro, excluding any mention of Joel, the jury may have been misled into thinking she was emotional solely because of Deltoro's abuse. He contends the jury might have inferred from her emotional state that the substance of the allegations regarding Deltoro was true.

The trial court, however, properly instructed the jury that Jordan's testimony was to be used to decide whether the disclosure was made, not to establish the truth of the assertions made in the disclosure. Deltoro interprets the court's instruction that the testimony could "either corroborate that it happened or not corroborate that it happened" to mean the testimony could be used to corroborate the assault allegation. But the "it" in the court's instruction clearly referred to the fact of the disclosure, not its content. Absent evidence to the contrary, we presume the jury followed the court's instructions. (*People v. Pinholster* (1992) 1 Cal.4th 865, 919 (*Pinholster*), disapproved on other grounds by *People v. Williams* (2010) 49 Cal.4th 405.) Deltoro's counsel conceded that the police reports she relied on for her proffer included the statement by A.D. that Deltoro had molested her. Whether A.D. told Jordan that Joel also molested her was irrelevant to the determination of whether A.D. had said Deltoro molested her.

Second, the trial court ruled that any questions to Jordan about whether A.D.'s display of emotion was due to Joel's abuse or Deltoro's abuse would have called for speculation by Jordan and were therefore irrelevant. There was no evidence proffered that A.D. somehow delineated the source of her emotional distress in her disclosure to Jordan. Even if she had, the probative value of the disclosure was the simple fact that A.D. had disclosed Deltoro's abuse regardless of the cause of her distress. If the jury had heard that A.D. was emotional because of Joel's abuse, it is unlikely the jury would have concluded from this that she did not also disclose Deltoro's abuse. The probative value of the excluded evidence was thereby weak, and it presented some potential for confusing or distracting the jury.

17

For the reasons above, we conclude the trial court did not abuse its discretion in excluding questions about any disclosures of Joel's alleged abuse. Nor did exclusion of such evidence violate Deltoro's constitutional right to present a defense. Trial courts retain wide latitude to impose reasonable limits on the questioning of witnesses. (See *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.)

### C. Jury Instructions on Unanimity Based on CALCRIM No. 3501

Deltoro contends the trial court erred by instructing the jury on the requirement of unanimity based on CALCRIM No. 3501 because C.D. testified about six specific incidents of molestation, but Deltoro was only charged with four. He asserts that neither the prosecutor's argument nor the stated charges identified which of the six incidents the four counts concerned, and that the jury therefore should have been instructed based on CALCRIM No. 3500 instead. The Attorney General contends Deltoro waived the claim by failing to object, and that in any event, any error was harmless. Deltoro argues that to the extent his trial counsel failed to object, counsel rendered ineffective assistance.

### 1. Background

As set forth above in section I.B.2, C.D. described six separate incidents in which Deltoro sexually assaulted her. In counts 3 through 6, the first amended information charged four counts of forcible lewd acts alleged in identical fashion and committed over the same time period. None of the counts described any of the specific details that would have allowed jurors to identify a given count with any one of the acts C.D. described in her testimony.

After the close of evidence, the trial court instructed the jury based on CALCRIM No. 3501: "The defendant is charged with lewd and lascivious acts in Counts 2 [*sic*] through 6 regarding [C.D.] only. The People have presented evidence of more than one act to prove the defendant committed these offenses against [C.D.] [¶] You must not find the defendant guilty unless, one, you all agree the People have proved the defendant committed at least one of these acts against [C.D.], and you all agree on which acts he

committed -- which act he committed for each offense, or you all agree the People have proved the defendant committed all the acts alleged to have occurred against [C.D.] and have proved the defendant committed at least the number of offenses charged."

The verdict forms recording the verdicts of guilt on each count did not specify which of the acts corresponded to each count.

### 2. *Legal Principles*

"In a criminal case, a jury verdict must be unanimous." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Additionally, the jury must agree unanimously the defendant is guilty of a specific crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*Ibid.*) "The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done something sufficient to convict on one count." (*People v. Deletto* (1983) 147 Cal.App.3d 458, 472.)

Even absent a request, the trial court should give a unanimity instruction " 'where the circumstances of the case so dictate.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.) " 'In a case in which the evidence indicates the jurors might disagree as to the particular act defendant committed, the standard unanimity instruction [e.g. CALCRIM No. 3500] should be given. [Citation.] But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction [e.g. CALCRIM 3501] which, in addition to allowing a conviction

19

if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim.' [Citation.]" (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 555-556, quoting *People v. Jones* (1990) 51 Cal.3d 294, 321-322 (*Jones*).) Thus, the pattern instruction in CALCRIM No. 3501 should be used when a witness testifies to numerous, repeated acts of child molestation over a period of time, but the witness is unable to distinguish between the acts with specifics details such as the time, date, or location of each act— what is sometimes described as "generic" testimony. (See *Jones*, at p. 321.)

### 3. Instruction Based on CALCRIM No. 3501 Was Not Prejudicial Error

The Attorney General does not dispute that C.D. described six discrete incidents of sexual assault and that the prosecution did not elect to specify which four incidents it was charging, thereby necessitating a unanimity instruction. Nor does the Attorney General contend that CALCRIM No. 3501 should have been given instead of CALCRIM No. 3500. Rather, the Attorney General contends the claim was forfeited on appeal, and that the giving of CALCRIM No. 3501 was harmless in any event. Because Deltoro alternatively raises a claim of ineffective assistance of counsel if trial counsel forfeited the claim, we address the merits of the claim.

Deltoro argues that because C.D. described six discrete incidents instead of a series of generic acts that could not be individually distinguished the trial court erred by not instructing the jury based on the "standard" unanimity instruction—CALCRIM No. 3500—which states, "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed." (CALCRIM No. 3500.) The court instead used CALCRIM No. 3501, which allows the jury to reach unanimity in one of two ways: First, the jurors could all agree on which act Deltoro committed for each charge; this is the same approach to reaching unanimity as instructed in CALCRIM

20

No. 3500.  Alternatively, the jurors could all agree that Deltoro committed *all* the acts C.D. alleged, and that the number of such acts was at least four.

We agree that the factual allegations in C.D.'s testimony described six incidents distinguishable based on the specific details—e.g., the specific conduct alleged and the location of each incident.  Based on these facts, CALCRIM No. 3500 would have been more appropriate; the Attorney General does not dispute this.  We agree with the Attorney General, however, that giving CALCRIM No. 3501 was harmless in this instance.

"We presume absent contrary indications that the jury was able to follow the court's instructions." (*Pinholster*, *supra*, 1 Cal.4th at p. 919.)  So either the jury found unanimity based on the first part of CALCRIM No. 3501, which is identical to the approach required by CALCRIM No. 3500, or the jury followed the second part of CALCRIM No. 3501.  If they used the approach set forth in the second part, all the jurors must have agreed that Deltoro committed all six incidents.

The situation that arose here was addressed by the California Supreme Court in *Jones*:  "[I]f an information charged two counts of lewd conduct during a particular time period, the child victim testified that such conduct took place *three* times during that same period, and the jury believed that testimony in toto, its difficulty in differentiating between the various acts should not preclude a conviction of the two counts charged, so long as there is no possibility of jury disagreement regarding the defendant's commission of any of these acts." (*Jones*, *supra*, 51 Cal.3d at p. 321.)  If all the jurors believed Deltoro committed all six of the alleged acts, as required for a conviction under the second part of CALCRIM No. 3501, then no harm resulted from the giving of that instruction.  Any error was thereby harmless under either the federal or the state law standard for prejudice.  (See *Chapman*, *supra*, 386 U.S. at p. 24; cf. *People v. Watson*

21

(1956) 46 Cal.2d 818, 836 (*Watson*) [whether a more favorable result would have been reasonably probable in the absence of error].)  The result would be the same under a claim of ineffective assistance of counsel.

Deltoro does not adequately explain how he was prejudiced by the use of the instruction.  He concedes that his defense at trial was that he had committed none of the acts whatsoever.  The jury rejected this defense, finding the victim's testimony more credible than his.[3]  "[B]ecause credibility is usually the 'true issue' in these cases, 'the jury either will believe the child's testimony that the consistent, repetitive pattern of acts occurred or disbelieve it.  In either event, a defendant will have his unanimous jury verdict [citation] and the prosecution will have proven beyond a reasonable doubt that the defendant committed a specific act, for if the jury believes the defendant committed all the acts it necessarily believes he committed each specific act [citations].' " (*Jones*, *supra*, 51 Cal.3d at p. 322.)

Deltoro argues that the evidence for some of the incidents was weaker than others, and he therefore posits that the jury could have believed he was guilty of only four of the incidents without agreeing on each of the four.  But this ignores the second part of the instruction based on CALCRIM No. 3501 that required the jury, if they elected to follow that part, to agree that Deltoro committed *all* the alleged acts.  Under this part of the instruction, the jury would have agreed that he committed all six acts, regardless of any differences in the weight of the evidence supporting them.  And of course if the jury instead took the approach set forth in the first part of the instruction, the jurors all expressly agreed on which of the four acts he had committed, which is precisely what is required under CALCRIM No. 3500.

For the reasons above, we conclude this claim is without merit.

---

[3] Deltoro does not contend that the prejudice resulting from the trial court's improper comments, addressed in section II.H below, cumulatively added to any prejudice from this claim.

### D. Prosecutorial Misconduct During Closing Argument

Deltoro contends the prosecutor committed misconduct in his closing argument by urging the jury to use the CSAAS testimony in a way that violated the law regarding permissible uses of CSAAS evidence. The Attorney General argues the prosecutor did not commit prejudicial misconduct because there is no reasonable likelihood the prosecutor's statements misled the jury as to the proper use of CSAAS evidence.

#### 1. Background

Deltoro moved pretrial to exclude CSAAS testimony as no longer necessary because the pervasiveness of information about child sexual abuse has rendered CSAAS outdated, and because the evidence did not satisfy the evidentiary requirements for expert testimony under Evidence Code section 801 as construed by *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747. Alternatively, Deltoro requested a jury instruction limiting the permissible uses of CSAAS evidence in accordance with *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*) and related cases. The trial court denied the motion to exclude and admitted the testimony subject to the limitation that it could not be introduced for the purpose of applying CSAAS to the facts of this case to conclude the victims had been abused.

The prosecution's expert testified in generic fashion about the purpose and components of CSAAS as set forth in section I.B.3 above.

After the close of evidence, the trial court instructed the jury as follows: "Doctor Carmichael's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not A.D.'s and C.D.'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of A.D.'s and C.D.'s testimony." Defense counsel objected to the latter portion of this instruction regarding the use of CSAAS in evaluating witnesses' believability, but the court overruled the objection.

23

In his closing argument, the prosecutor addressed the timing and manner of the disclosures made by C.D. and A.D. He argued, "Incremental disclosures were made in this case, people that they trusted in the moment. And what does this show? At fourth grade and eighth grade, they're telling people. [¶] Is this 'Ocean's Eleven,' where they have some elaborate plan at a young age to tell these girls that are friends, thinking that down the road they'll be used against the defendant? No. There's no sophistication here, some elaborate ruse or plan. This is these girls living their life with what's happened to them and telling the people that they trust."

The prosecutor then segued into a discussion of the CSAAS evidence. "The circumstances around the disclosure are also important. And I talked about this already. The manner in which they told the disclosure, very similar to the way we saw the girls testify, and their behavior as well. [¶] We heard from expert Dr. Carmichael about Child Sexual Abuse Accommodation Syndrome. And the purpose of that was to dispel myths about how we would expect children to behave if they've been molested. As he testified to, it's not a checklist. You're not to go through these things he talked about and go through and check off the list. It's simply to educate. And what we heard is about certain things -- about secrecy, helplessness, delayed reporting -- many things we observed in this case."

After describing the secrecy and helplessness components of CSAAS, the prosecutor referred to the entrapment component and connected it to A.D.'s avoidance of Deltoro: "Carmichael talked about kids feeling trapped and disassociating themselves, both mentally and physically, physically trying to avoid the individual. We heard from A.D. she'd go outside." Defense counsel objected on the ground that this use of CSAAS exceeded its permissible uses. The court did not rule on the objection but instructed the jury, "Ladies and gentlemen, what the attorneys say is not evidence." The prosecutor resumed his argument and stated, "We heard about wearing different things," and defense counsel objected again. The trial court overruled this objection.

24

The prosecutor then continued: "We heard about mentally focusing during these incidents, that individuals -- he gave the earthquake example -- individuals focus on different things during traumatic events, and a lot of times individuals will focus on peripheral things. [¶] We have delayed and conflicting reporting, fearful of reprisal, not being believed, getting in trouble themselves. You heard about incremental disclosures and the difference between core and peripheral remembering. You heard about retraction, about taking things back. [¶] You heard the testimony from him to dispel myths. You can use that in deciding whether the testimony, the behavior, of these girls was consistent or inconsistent with someone who has been molested." Defense counsel then objected again, stating, "Objection. Not behavior, testimony." The trial court did not rule on the objection but again instructed the jury that what the attorneys say is not evidence. The prosecutor added, "It's in the instruction. Read the instruction about how you can use it, ladies and gentlemen." The prosecutor then moved on to other issues.

### 2. *Legal Principles*

CSAAS evidence is admissible for limited purposes. It may not be used to prove the alleged sexual abuse actually occurred, but CSAAS is admissible "for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse. [Citations.]" (*In re S.C.* (2006) 138 Cal.App.4th 396, 418.) The prosecution may explicitly identify misconceptions about victims' behavior that CSAAS testimony is intended to rebut. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450.) Such evidence may be relevant and admissible where a victim's conduct relates directly to those misconceptions. (*Id.* at p. 450.) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust." (*Bowker*, *supra*, 203 Cal.App.3d at p. 394.)

25

It is improper for a prosecutor to urge a jury to use evidence for a purpose other than the limited purpose for which it was admitted. (*People v. Lang* (1989) 49 Cal.3d 991, 1022, abrogated on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176.) "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202 (*Cole*).)

"When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citation.]" (*Cole, supra*, 33 Cal.4th at pp. 1202-1203.) "[W]e must view the statements in the context of the argument as a whole. [Citation.]" (*Id.* at p. 1203.)

### 3. *The Prosecutor's Use of CSAAS Evidence in Closing Argument*

Deltoro contends the prosecutor committed misconduct because he misstated the law and urged the jury to apply CSAAS to the facts of the case to find that the victims' behavior was consistent with having been sexually abused. The Attorney General argues it is not reasonably likely jury used CSAAS evidence in an impermissible fashion based on the prosecutor's argument. The Attorney General points to the prosecutor's statement that CSAAS is intended to dispel myths about how molested children behave and his urging the jury to read the jury instruction on CSAAS.

Longstanding caselaw prohibits the use of an expert's general testimony about the components of CSAAS by applying it to the specific facts of the case to conclude a child was sexually abused. (*Bowker, supra*, 203 Cal.App.3d at p. 393.) CSAAS evidence may

26

be used instead for the purpose of showing the victim's reactions are "*not inconsistent with* being molested." (*Id.* at p. 394, italics added.) We acknowledge the line between these two uses is a thin one, but it is not without meaning. The permissible use of CSAAS evidence is premised on jurors believing myths about how an abused child would behave—e.g., that the child would promptly and clearly report the abuse. If the complaining witness delayed disclosure or disclosed the abuse in an ambiguous fashion, the prosecutor can use CSAAS evidence to argue that this behavior does not show the witness lied about being abused. That is distinct from arguing that the CSAAS components of the witness's behavior shows she was actually abused.

The prosecutor's closing argument did not expressly delineate this distinction. The prosecutor did refer to parts of the expert's testimony that set forth the admissible purposes of the evidence—to educate and dispel myths—but as to other statements, there was a reasonable likelihood a juror could have construed the prosecutor as arguing CSAAS-related elements of the witnesses' behavior showed they were abused. The context immediately preceding the mention of CSAAS reinforced this likelihood. The prosecutor characterized the "incremental disclosures" as the "girls living their life with what's happened to them and telling the people they trust," as opposed to "some ruse or elaborate plan." In other words, the prosecutor argued the disclosures were true—that the girls had actually been molested. He then argued that "the circumstances around the disclosure," "[t]he manner in which they told the disclosure[s]," and "their behavior as well" were all important. The prosecutor then immediately raised the CSAAS testimony. In doing so, he matched specific examples of the girls' behavior with several if the CSAAS components—e.g., how A.D. would go outside to avoid Deltoro, or how C.D. stopped wearing certain clothes she had been wearing during the incidents.

The prosecutor did mention the permissible uses of CSAAS—to educate and dispel myths. But considering the argument as a whole—including the preceding context in which the prosecutor directly implied the disclosures were sincere, and how he then

27

matched examples of the girls' behavior to CSAAS components—there was a reasonable chance a juror could have construed it to mean that the similarities between the girls' behavior and the CSAAS components were evidence that Deltoro had molested them. The prosecutor referred to the limiting instruction for CSAAS evidence—that jurors could use it in deciding whether the girls' behavior was "consistent or inconsistent with someone who has been molested"—but given the context of the argument, the jury could have thought that examples of the girls' conduct "consistent with" CSAAS evidence meant that they had been molested. We therefore conclude there was "a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citation.]" (*Cole, supra*, 33 Cal.4th at pp. 1202-1203.) As to the prejudicial effect of this misconduct and whether it was "of sufficient significance to result in the denial of the defendant's right to a fair trial," *ibid.*, we do not think this claim standing alone would require reversal. We consider how the prejudicial impact of this error contributed to the cumulative prejudice from multiple errors in section II.H below.

### E. Erroneous Verdict Forms

The trial court issued verdict forms to the jury on which the charged offense for counts 2 through 6—a lewd act by force or duress under subdivision (b)(1) of section 288—was accurately described as a felony. The forms for each count also included the option to find Deltoro guilty of the lesser included offense of a lewd act on a child under subdivision (a) of that section. This offense was a felony, but the forms erroneously stated it was a misdemeanor. Defense counsel did not object.

We requested supplemental briefing from the parties on the significance, if any, of these verdict forms. Deltoro contends the error is akin to an instructional error and he argues it should be analyzed within the same framework. As such, he contends that, despite the lack of an objection, the issue is preserved for review under section 1259, which provides that the appellate court may review any instruction given even though no objection was made. Alternatively, he argues defense counsel rendered ineffective

28

performance by failing to object.  The Attorney General contends the failure to object to a defect in the verdict forms forfeits the claim on appeal.  (*People v. Bolin* (1998) 18 Cal.4th 297, 330 [issue of defect in verdict form waived by failure to object] (*Bolin*).)  As to the claim of ineffective assistance of counsel, the Attorney General contends Deltoro cannot show he was prejudiced.

### 1.  *Legal Principles*

"It is settled that in the trial of a criminal case the trier of fact is not to be concerned with the question of penalty, punishment or disposition in arriving at a verdict as to guilt or innocence."  (*People v. Allen* (1973) 29 Cal.App.3d 932, 936.)  "It is fundamental law in California that the trier of fact is not to consider the subject of penalty or punishment in arriving at its decision of guilt or innocence.  [Citation.]  This notion derives from the traditional division of duty between the court and jury: a jury is to decide questions of fact placed before it; the court is to rule on questions of law.  The issue of punishment being a question of law is exclusive to the court and therefore extraneous to the jury."  (*People v. Moore* (1985) 166 Cal.App.3d 540, 549 (*Moore*).)

"[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice."  (*People v. Webster* (1991) 54 Cal.3d 411, 447 (*Webster*).)

To establish ineffective assistance of counsel, the defendant bears the burden of showing trial counsel's performance was deficient: that counsel's performance "fell below an objective standard of reasonableness" in light of the prevailing professional norms.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*).)  " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' "  (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.)  Second, the defendant must show the asserted

deficiency in counsel's performance resulted in prejudice: a " ' "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*Id.* at p. 955.)

### 2. *Effect of the Erroneous Verdict Forms*

The Attorney General concedes the verdict forms erroneously stated the offense was a misdemeanor, and it is indisputable that the jury should not have been so informed. It legally wrong to describe the offense as a misdemeanor, and the issue of punishment was irrelevant to the jury's deliberations. (*Moore*, *supra*, 166 Cal.App.3d at p. 549.) Most jurors would likely know that a felony conviction results in a harsher punishment than a misdemeanor. The danger, as Deltoro points out, is that the jury could have been improperly dissuaded from finding him guilty of the lesser included offense if it felt a lewd act on a child is too serious to be punished as a misdemeanor notwithstanding any lack of force or duress. The Attorney General argues he forfeited the claim by failing to object below. Deltoro contends the failure to object would have constituted ineffective assistance of counsel.

First, Deltoro argues the error was akin to an instructional error and violated his federal constitutional due process rights to have the jury determine all factual issues relating to a charged offense. He argues that we may review this claim under section 1259, which allows for appellate review of a claim absent objection below if the claim is one of instructional error affecting a defendant's substantial rights. Deltoro cites several cases for this proposition, but these involve the failure to instruct on a lesser included offense, instructional errors on the elements of an offense, or other errors affecting a defendant's federal constitutional rights. (See, e.g., *People v. Lewis* (2001) 25 Cal.4th 610, 645 [a defendant has a constitutional right to have the jury determine every material issue presented by the evidence and an erroneous failure to instruct on a lesser included offense constitutes a denial of that right].) But the error here did not concern the elements of any offense or any material issue presented by the evidence. Nor did the trial

court fail to instruct on the lesser included offense altogether. The court properly instructed the jury on the elements of both the lesser included offense as well as the charged offense, including the element of force or duress.

We cannot say, however, that the erroneous verdict forms constituted a mere "technical defect" as that term is generally used in the case law; in this case, the forms included an outright misstatement of the law. (See *People v. Johnson* (2015) 61 Cal.4th 734, 783 [verdict form for death penalty judgment listed two murders where only one of the murders was punishable by death, but defect was not entirely incorrect because the multiple-murder circumstance made defendant eligible for the death penalty]; *Bolin, supra*, 18 Cal.4th at p. 330 [verdict cited incorrect penal code section number]; *Webster, supra*, 54 Cal.3d at p. 447 [form of general verdict included the theory of liability]; *People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272 [verdict form referred to the charged count as carjacking instead of second degree robbery].)

Even if the error could be considered instructional for the purposes of review under section 1259, Deltoro cites no cases holding that this specific type of error constitutes a violation of a federal constitutional right. Assuming the jury understood that a misdemeanor exposes the accused to a lesser penalty than a felony, the federal constitution has never prohibited a jury from considering punishment. (See *Chaffin v. Stynchcombe* (1973) 412 U.S. 17, 22.) Here, the jury was *mis*informed about the punishment for an offense, but to the extent a jury may be misled about the penal consequences of a verdict, California courts generally treat it as a violation of state law. (See, e.g., *People v. Ramos* (1984) 37 Cal.3d 136, 151 [comparing the constitutionality of the so-called "Briggs Instruction" in capital cases under the state and federal constitutions].) Accordingly, we would assess any prejudice from this error under the standard of *Watson, supra*, 46 Cal.2d at p. 836 [defining prejudice as a reasonable probability of a more favorable outcome in the absence of the error].)

Alternatively, if we concluded the claim was not reviewable under section 1259 because it is not an instructional error within the meaning of that section, we would assess it as ineffective assistance of counsel under *Strickland*, *supra*, 466 U.S. 668. Defense counsel should have objected to the erroneous verdict forms, and we cannot imagine any tactical reason for declining to do so. Because this constitutes deficient performance, we would assess prejudice under the applicable standard: whether there is a reasonable probability the result of the proceeding would have been different absent counsel's error. (*Id.* at p. 694.) As applied here, there is no material difference between this standard and the *Watson* standard for prejudice. (See *Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050 [comparing *Watson* standard for prejudice to *Strickland* standard].)

Under either rubric, whether we reviewed the issue as instructional error or ineffective assistance, the prejudice standard would require Deltoro to show there was reasonable probability of a different outcome had the verdict forms not contained the error. Because we are reversing the judgment in its entirety as set forth below in section II.H, we do not address the issue of prejudice.

## F. *The Trial Court's Statements to the Juror Panel During Voir Dire*

Deltoro contends the trial court committed misconduct by improperly commenting on the prosecution's evidence during the court's voir dire of prospective jurors. In its voir dire, the court expressed concern that some potential jurors might refuse to render a guilty verdict based solely on witness testimony in the absence of corroborating evidence such as DNA analysis, fingerprints, or eyewitnesses. In its attempt to identify any such jurors, the court made several statements and asked several questions about jurors' ability to credit witness testimony. Deltoro argues these statements improperly bolstered the prosecution's case and prejudiced jurors against him by dissuading them from finding a witness's testimony was not credible. The Attorney General argues the trial court

32

properly responded to a juror's concern about corroboration and that the court properly stated the standard instruction on the sufficiency of a single witness's testimony.

### 1. Background

In voir dire, the trial court described to prospective jurors the "single-witness rule" that allows jurors to find a fact based on the testimony of a single witness or to convict a defendant of a sexual assault offense based solely on the testimony of a complaining witness.[4] The court stated, "[B]asically, if you believe the testimony of a single witness on some fact that has to be proven, it can be proven based upon that testimony of a single witness. So you don't count the numbers of people on each side or that sort of thing. And then you only need one witness. [¶] And then for sexual assault cases, the – there's a separate instruction that's similar. It says the same thing, which is, basically, after you look at all the evidence, if you believe the evidence has been proved beyond a reasonable doubt, you can rest on the testimony of one witness."

The court then described a hypothetical case to illustrate the rule as follows: "[L]et's say a boy comes in here and says, 'I was sexually assaulted by the guy who lived next door.' [¶] The People rest their case in chief and say, 'We have no other evidence.' And that's the entire – the defense puts on no evidence. [¶] So the only evidence in your trial, if you were to sit on that particular trial, would be a boy saying one sentence, which is 'My next-door neighbor molested me.' [¶] 'Any other questions?' [¶] 'No.' [¶] 'Thank you very much. You can go home.' [¶] The law in the state of California is you can rely on that testimony of one witness to convict that next-door neighbor of having molested that boy. And you can't decide the case on anything else, because the jurors are limited to, by law, only deciding the case on the evidence. [¶] So I bring this up because sometimes, because of whatever country you might be from or the way you grew up or your personal feelings or maybe what you see on TV, you're not comfortable with that.

_____

[4] See, e.g., CALCRIM No. 301 and CALCRIM No. 1190, which were given to the jury after the close of evidence as set forth below.

33

You don't think you should be able to convict somebody on the testimony of a single witness. You think, 'Well, we need two witnesses,' or 'We need a video,' or 'We need a confession,' or 'We need a neighbor seeing the neighbor go in there about the same time as the boy said, 'I was molested.' [¶] But the law says the People don't have to prove that and the jurors can convict on the testimony of a single witness. Is there anybody who has heartburn about that? [D]ifficulty? [C]oncern? You think, 'I need two people.' "

A prospective juror responded, "[I]n the scenario you described, my personal opinion is there is no way you can convict on that." The court explained that this was an extreme example, and that in "real life" there would be a lot of questioning and cross-examination of the witness, but the juror still expressed reluctance in his ability to convict without additional witnesses or "something to back it up" like video, DNA, or fingerprints.

The court then stated, "[T]hat brings up another issue, which is 99.9 percent of cases in the United States, there is no DNA; there is no fingerprints; there is no gunshot trajectory evidence, despite what you see on TV. [. . .¶. . .] And so you're not going to get DNA in this case. You're not going to get fingerprints in this case."

At this point, defense counsel objected, but the court continued: "You're not going to get any kind of forensic evidence in this case. [¶] What you're going to get is words. Words are evidence. I've been to social events where people say, 'There was no evidence. All we heard was people talk.' Well, I'm here to tell you words are evidence. That's the law in California and in the United States and most of the world. [¶] Because most cases are decided on words. People come in and say what they believe happened to them, and you decide if that's true. That's especially important in sexual assault allegation cases because, oftentimes, in cases of sexual molestation, there is no DNA; there is no fingerprints."

34

The court then asked again if there were any prospective jurors who would be unable to decide the case based on the testimony of a single witness without something like video, DNA, or fingerprints. The same prospective juror who had previously responded did so again and reiterated that he would require some corroboration. Another prospective juror added that he would have "some challenges" with trying to decide whether a witness was telling the truth or lying and basing a verdict on that evidence. The court responded, "So what's going to happen is the girls are going to come in. They're going to say what they're going to say. You either believe them or you don't. Okay? Then you're going to hear a bunch of other evidence, but probably not. You might hear some experts come in and talk about how do children react to sexual assault." Defense counsel objected again and offered to set forth basis for the objection in limine. The court then continued with its voir dire.

The next day, outside the presence of the prospective jurors, defense counsel objected that the trial court was essentially "pretrying" the case and had exceeded the bounds of what was permissible or appropriate during voir dire. The trial court overruled the objection and responded, "That is a common thing that is said in almost every sexual assault case. Because jurors expect DNA; they expect fingerprints; they expect semen. And so I need to tease out those jurors who that may be an issue for and find out if it makes a difference. Because if one juror says, 'If there's no DNA, I can't vote guilty,' we have a problem."

After the close of evidence, the trial court instructed the jury consistent with CALCRIM No. 226, stating in relevant part: "You alone must judge the credibility or believab[ility] of the witnesses in deciding whether testimony is true and accurate. Use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe, all, part or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe." Consistent with CALCRIM No. 301, the court

instructed the jury, "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." Similarly, consistent with CALCRIM No, 1190, the court instructed the jury, "Conviction of a sexual assault crime against C.D. may be based on the testimony of C.D. alone. Conviction of a sexual assault crime against A.D. may be based on the testimony of A.D. alone."

### 2. *Legal Principles*

"To select a fair and impartial jury in a criminal jury trial, the trial judge shall conduct an initial examination of prospective jurors." (Code Civ. Proc., § 223, subd. (a).) "Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.' [Citations.] This is so because the 'determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge.' " (*Ristaino v. Ross* (1976) 424 U.S. 589, 594-595.) (See *People v. Foster* (2010) 50 Cal.4th 1301, 1325 [citing *Ristaino*].) Accordingly, "California trial judges have broad discretion over the specific manner in which voir dire is conducted." (*People v. Lenix* (2008) 44 Cal.4th 602, 608.)

"The court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." (Cal. Const., art. VI, § 10.) Such comment, however, must be " ' "accurate, temperate, nonargumentative, and scrupulously fair. The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power." ' [Citation.] Thus, a trial court has 'broad latitude in fair commentary, so long as it does not effectively control the verdict.' [Citation.]" (*People v. Monterroso* (2004) 34 Cal.4th 743, 780.) "We determine the propriety of judicial comment on a case-by-case basis." (*People v. Cash* (2002) 28 Cal.4th 703, 730.) We

consider whether the judge's conduct was so prejudicial that it denied the defendant a fair trial. (*People v. Snow* (2003) 30 Cal.4th 43, 78 (*Snow*).)

### 3. Prejudicial Effects of the Trial Court's Comments

Deltoro concedes that, as a matter of law, it was permissible for the jury to find him guilty based on the testimony of a single witness with no physical evidence. And he concedes that it was important for the trial court to determine whether there were jurors who could not adhere to this principle. But he asserts the trial court's statements were improper in two ways. First, he argues the court acted improperly when it told prospective jurors they would not get any evidence corroborating the complaining witnesses' testimony and that they could still convict him because "most cases are decided on words." Second, he argues the court impliedly dissuaded jurors from finding that the complaining witnesses' testimony was insufficiently credible to support a conviction.

As Deltoro points out, while the jury *could* lawfully convict him on the basis of a single witness's testimony, the jury was also empowered to find that evidence insufficient for a finding of guilt. Moreover, the single-witness rule is not limited to prosecution witnesses; it applies to a defense witness as well. (See *People v. Turner* (1990) 50 Cal.3d 668, 695-697.) A jury may find reasonable doubt based on the testimony of a single defense witness and acquit the defendant on this evidence alone.

The portion of the trial court's comment described above offered an imbalanced presentation of these principles. First, the trial court's hypothetical example—which the court itself later described as "extreme"—was unnecessary and unhelpful in this regard. The court described a hypothetical prosecution case consisting entirely of a single complaining witness who said nothing more than, "I was sexually assaulted by the guy who lived next door," with no further testimony or evidence from either party. The court said nothing about whether this witness appeared to be sincere and credible in their testimony. The court added, "The law in the state of California is you can rely on that

37

testimony of one witness to convict that next-door neighbor of having molested that boy. And you can't decide the case on anything else, because the jurors are limited to, by law, only deciding the case on the evidence." The court then asked whether any prospective jurors would have any difficulty or "heartburn about" convicting a defendant in such a case.

The extreme nature of this example tended to undercut the importance of jurors' duty to consider the force and weight of a witness's testimony. The court subsequently softened its example somewhat, adding that in a "real life" case there would be additional questioning and cross-examination of the witness, but the court did not sufficiently emphasize the point that a jury could reasonably reject such testimony.

The court's hypothetical example was problematic in other ways as well. The court could have illustrated the evidentiary value of testimony using a more neutral scenario—e.g., a defendant charged with some other offense not at issue in this case, such as robbery. The court also could have added that there might be conflicting testimony from defense witnesses, in which case jurors would have to evaluate the credibility of the conflicting testimony. The court's hypothetical said nothing about the application of the single-witness rule to testimony by defense witnesses—e.g., that if a single defense witness gave testimony contradicting the victim's testimony, the jury could find this constituted reasonable doubt even if there was no corroboration. Instead, the hypothetical centered entirely on the evidentiary value of testimony by the victim in a sexual assault case.

In an earlier session with prospective jurors, the court told them, "Just so everybody understands, when I'm giving examples up here for hypotheticals, so that we can have a discussion and the jurors can wrap their heads around the kind of things we need to find out about where you are internally, that doesn't mean that my scenario is what this case is about. I'm talking about in general in society and the charges." But following its hypothetical illustrating the single-witness rule, the court immediately

38

turned to facts and evidence of *this* case by informing the jury, "You're not going to get any kind of forensic evidence in this case," and explaining there would be no forensic evidence like DNA or fingerprints. The court told the jury that California law allows testimony to be considered as evidence "[b]ecause most cases are decided on words. People come in and say what they believe happened to them, and you decide if that's true." At a minimum, these statements were unnecessary, as it is unclear whether "most cases" in California are decided solely on testimony or whether that is an accurate explanation for why this rule was developed. The court made unnecessary references to the likely testimony of the victims in this case. The court stated, "So what's going to happen is the girls are going to come in. They're going to say what they're going to say."

Instead of addressing how jurors should evaluate conflicting testimony by defense witnesses, the court simply stated that the defendant might not testify. When a potential juror expressed unease about the difficulty of resolving contradictory "he-said/she-said" testimony, the court asked the juror a question that assumed away any testimony by the defendant: "So are you saying that if the defendant chooses to not testify and the girls get up and say, 'He molested me,' that you can't make the call on whether that happened based only on their testimony?" At another point the court suggested Deltoro would *not* testify when the court ask the potential juror, "But are you going to have a problem with not getting he-said/she-said; *you're only going to get she said in this case*?" As set forth in section I.B.4 above, Deltoro did in fact testify in his defense, as did his brother.[5]

The court's repeated references in this portion of the voir dire to the evidentiary value of testimony by victims while ignoring the testimony of defense witnesses

---

[5] The record is unclear on when defense counsel gave notice of her intent to call Deltoro or his brother to testify. At a prior hearing on in limine motions, counsel had informed the trial court she had no witness list. When the court addressed prospective jurors at the start of jury selection, it appears counsel had told the court she would take about one day of trial to put on her case, and the court so informed the prospective jurors. After the jury was sworn, the court told jurors the defense would have the opportunity to call witnesses if it chose to do so.

improperly emphasized victim testimony. These statements predisposed jurors to credit the testimony of the complaining witnesses when weighing the conflicting testimony of each party's witnesses. Justice Mosk warned of the danger of an unbalanced misapplication of the single-witness rule in his concurring opinion in *People v. Gammage* (1992) 2 Cal.4th 693: "If understood to favor the testimony of the complainant in support of guilt and to disfavor the testimony of other witnesses in support of innocence, the no-corroboration instruction can indeed do harm. Put simply, it threatens to function as a thumb—or in the word the majority might use, a 'counterweight'—on the scales of justice, tilting the balance in the state's favor and thereby lightening its statutory and constitutional burden of proving the defendant guilty beyond a reasonable doubt." (*Id.* at p. 705 (conc. opn. of Mosk, J.).)

In addition, the trial court's voir dire presentation pushed the prospective jurors to conceive of the trial not in terms of evidence and their deliberative resolution of disputed material facts but simplistic up-or-down instincts as to the credibility of witnesses. The trial court explicitly posited that credibility could meaningfully be assessed in no more than an alleged victim's simple assertion, "My next-door neighbor molested me," and that "the law says the People don't have to prove [more than] that and the jurors can convict" on that conclusory assertion.

As with claims of prosecutorial error, we do not lightly infer that the jury drew the most objectionable meaning from what might otherwise be an isolated instance of rhetorical overstatement. But the record reflects that at least two prospective jurors did in fact draw the most objectionable meaning from the comment. Still, the court did not correct itself: it merely acknowledged that its example was "extreme" and not from "real life," but at no point did it retreat from its insistence that a jury's verdict could be distilled to a gut-check evaluation of a witness's single sentence, rather than a deliberative process guided by well-established, mandatory principles.

40

Apart from these reactions of actual prospective jurors, we are not convinced that the jurors eventually seated did not construe the trial court's comments on the single-witness rule in an objectionable way. This is because of other comments from the trial court about the jury's factfinding and evaluation of witness credibility. Contrary to CALCRIM No. 226, for example, the trial court opined to the prospective jurors: "It's sort of like you just know it. When you see them, you either know whether they're telling the truth or you know they're not. And that's just a thing that happens because we're all humans." Perhaps in "real life." But a jury's credibility determinations are expected to be the product of deliberations that do not begin until jurors are freed of the directive to reserve judgment and not form any opinions about the case and that, once commenced, are guided by mandatory instructions. (See *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 883-884 [requiring sua sponte instruction enumerating factors that "have a tendency in reason to prove or disprove the truthfulness of [witness] testimony" (*Rincon-Pineda*)]; see also CALCRIM No. 226.)

In summary, the trial court erred in this portion of the court's voir dire. While a hypothetical that tests the limits of a legal rule might help law students understand a legal precept, in this real-world case it could have confused jurors instead. To determine whether the error requires reversal, we must look at the trial court's statements as a whole, together with the jury instructions. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Kumar* (2019) 39 Cal.App.5th 557, 564.)

In previous statements during voir dire and in preliminary instructions, the court properly told jurors it was up to them to decide whether to believe a witness and added, "I don't want you to automatically think that just because somebody comes to court, they're going to tell the truth." And the court stated part of the one-witness rule in a more neutral fashion, telling jurors that "*if you believe the testimony of a single witness* on some fact that has to be proven, it can be proven based upon that testimony of a single witness." (Italics added.) The statement is consistent with CALCRIM No. 301, which has long

41

been approved by the California Supreme Court. (*Rincon-Pineda, supra,* 14 Cal.3d at pp. 884-885.) And in referencing the victims' testimony, the court stated, "They're going to say what they're going to say. *You either believe them or you don't.*" Furthermore, after the close of evidence, the court properly instructed jurors that they alone had the duty to judge the credibility of witnesses, and that they may believe all, part or none of any witness's testimony. In setting forth the one-witness rule based on CALCRIM No. 301, the court included the full statement of the rule, including the second part: "Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."[6] Finally, after closing arguments but prior to the start of deliberations, the court instructed the jury based on CALCRIM No. 3550, "It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be."

We are not convinced that the instructions were sufficient to cure the harm created by the court's statements, particularly in light of the other errors identified in this opinion and the compounding effect the court's voir dire statements had on the prejudice from those other errors. Whether or not this claim by itself would require reversal, we conclude in section II.H below that the cumulative prejudice in combination with other errors requires reversal.

### G. The Trial Court's Improper Statement Describing C.D. as "Traumatized"

At the end of C.D.'s testimony, the trial court made a comment in the presence of the jury in which the court described C.D. as "traumatized." Defense counsel did not object.

We requested supplemental briefing on the significance, if any, of the court's statement. Deltoro now contends this comment violated his due process rights because it implied C.D. was suffering trauma as a result of being sexually abused by Deltoro,

---

[6] In its voir dire comments, the trial court neglected to state the second part of the standard instruction.

further implying that Deltoro was guilty of those charges. The Attorney General contends the claim was forfeited by defense counsel's failure to object. The Attorney General further argues the comment was not prejudicial because it was ambiguous, fleeting, and isolated. The Attorney General argues the trial court was simply describing what was already obvious to the jury. Deltoro argues that an objection by defense counsel would have been futile, but if the claim was forfeited by failure to object, then counsel rendered ineffective assistance.

### 1. *Background*

Prior to the break in proceedings resulting from the COVID-19 pandemic, C.D. testified about an incident in which she was reading a book on the bed in her cousin's bedroom when Deltoro entered, put his hands on her hips, and rubbed his groin against her buttocks while telling her to read aloud from the book. When defense counsel asked C.D. on cross-examination if Deltoro put her hand on his penis in that incident, C.D. responded, "Not that I remember." After the COVID-19 break, C.D. resumed her testimony and testified on redirect that Deltoro made her touch his penis in that incident. On recross, defense counsel asked C.D. whether she recalled that she had previously testified she did not remember Deltoro putting her hand on his penis. C.D. answered that she did not remember being asked that question and added, "I don't want to remember any of this." Defense counsel asked C.D., "Do you not want to remember this because it didn't happen, C.D.?" C.D. responded, "I don't want to remember this because it makes me . . . in so much pain." Defense counsel asked no further questions, and C.D.'s testimony ended.

The trial court then asked C.D., "C.D., did you want to take a moment, or you okay with walking out of the courtroom at this time?" She responded, "I would like to leave, please." After she left the stand, the court stated in the presence of the jury, "We

43

need to disinfect, because C.D. was too traumatized to do that."[7]  Defense counsel did not

object and did not request any instruction, admonitions, or clarifications.

### 2. *Legal Principles*

"A fair trial in a fair tribunal is a basic requirement of due process."  (*In re Murchison* (1955) 349 U.S. 133, 136.)  "Under current article VI, section 10 [of the California Constitution], '[t]he court may make such comment on the evidence . . . *as in its opinion is necessary for the proper determination of the cause*.' "  (*People v. Rodriguez* (1986) 42 Cal.3d 730, 766 (*Rodriguez*).)  "The appellate courts have recognized, however, that this powerful judicial tool may sometimes invade the accused's countervailing right to independent jury determination of the facts bearing on his guilt or innocence.  Hence, the decisions admonish that judicial comment on the evidence must be accurate, temperate, nonargumentative, and scrupulously fair."  (*Ibid.*)  "A trial court should of course refrain from making comments before the jury that might suggest it has allied itself with the prosecution."  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320 (*Seumanu*).)

In determining the impact of judicial comments on a defendant's right to a fair trial, "We make that determination on a case-by-case basis, examining the context of the court's comments and the circumstances under which they occurred.  [Citation.]  Thus, the propriety and prejudicial effect of a particular comment are judged by both its content and the circumstances surrounding it.  [Citation.]"  (*People v. Abel* (2012) 53 Cal.4th 891, 914 (*Abel*).)  "In addition, a defendant who fails to make a timely objection to the claimed misconduct forfeits the claim unless it appears an objection or admonition could not have cured any resulting prejudice or that objecting would have been futile."  (*Ibid.*)

---

[7] To reduce the risk of spreading COVID-19, the trial court required each witness to wipe down the microphone on the witness stand.

### 3. *The Trial Court's Statement Was Improper*

Deltoro argues the trial court's description of C.D. as "traumatized" was improper because it implied she had been sexually abused, which was a question of fact for the jury. The Attorney General argues the comment was ambiguous and "context dependent." The context, however, supports Deltoro's position. Defense counsel had just questioned C.D. about her changed testimony on a material fact, prompting C.D. to respond that she did not want to remember "any of this" because she was in so much pain. The obvious implication of the court's comment was that C.D.'s expression of pain was sincere, and that she was in pain because she had in fact been molested. Thus, not only did the comment bolster her credibility, it implied Deltoro was guilty. Indeed, as set forth below, the prosecutor in closing argument repeatedly cited to C.D.'s demeanor on the stand as evidence of Deltoro's guilt.

Furthermore, the trial court made the comment immediately after defense counsel had attempted to impeach C.D. with her prior conflicting testimony about whether Deltoro put her hand on his penis during one of the incidents. In response to defense counsel's questions, C.D. testified that she did not recall having been asked about the matter because she was in too much pain. The timing of the trial court's statement invited jurors to interpret the court's comment as an endorsement of C.D.'s justification for her inconsistent testimony. C.D.'s inability to recall the subject of the impeachment thus became more than merely a factor to be considered by the jury in evaluating the credibility of her testimony, but proof positive of the content of that testimony. In short, the potential takeaway for the jury was that C.D. was too traumatized to be able to recall what Deltoro did, but Deltoro was the cause of that trauma.

It was for the jury to decide whether C.D. indeed felt traumatized as the result of being molested; the trial court's comment improperly invaded the jury's fact-finding province. (See *People v. Foster* (1971) 19 Cal.App.3d 649, 657 [a judge may not comment on the evidence in a manner that invades the province of the jury].) While the

45

California Constitution grants courts some limited power to comment on evidence, this comment was not "necessary to a proper determination of the cause." (Cal. Const., art. VI, § 10.) Nor was the comment "scrupulously fair," *Rodriguez*, *supra*, 42 Cal.3d at page 766; it obviously tended to support the prosecution's case by implying Deltoro was guilty of the allegations C.D. set forth in her testimony. It has long been the rule in California that, "The trial court, under the guise of comment, may not properly control the verdicts by a direction either directly or *impliedly* made." (*People v. Dail* (1943) 22 Cal.2d 642, 658.) "The ultimate responsibility for determining the guilt or innocence of the accused must remain with those in the jury box. 'This principle is so well established that its basis is not normally a matter of discussion.' [Citation.]" (*People v. Cook* (1983) 33 Cal.3d 400, 408 (*Cook I*), overruled on other grounds by *Rodriguez.*)

Federal law similarly constrains a trial court's power to comment on the credibility of witnesses when the court's comment goes directly to the matter of guilt. In *Quercia v. U.S.* (1933) 289 U.S. 466 (*Quercia*), the United States Supreme Court considered the statement of a trial court opining to a jury that the defendant had lied in his testimony. The defendant had testified in his defense and denied all the charges. (*Id.* at p. 468.) After instructing the jury on the presumption of innocence and reasonable doubt, the trial court told the jury that in the court's opinion the defendant had lied in nearly all of his testimony. (*Ibid.*) The court explained that the defendant had "wiped his hands during his testimony," which is "almost always an indication of lying." The court then admonished the jury, " 'Now, that opinion is an opinion of evidence and is not binding on you, and if you don't agree with it, it is your duty to find him not guilty.' " The Supreme Court held the trial court's comments resulted in highly prejudicial error that required reversal. "Dealing with a mere mannerism of the accused in giving his testimony, the judge put his own experience, with all the weight that could be attached to it, in the scale against the accused." (*Id.* at p. 471.) The Supreme Court further held that the trial court's admonition was insufficient to cure the prejudice. "[The trial court's]

characterization of the manner and testimony of the accused was of a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence." (*Id*. at p. 472.)

The prohibition on improper judicial comments about the evidence is not limited to express statements on a defendant's guilt. When a trial court makes a statement corroborating or denigrating a witness's credibility, and the outcome of the trial depends on the credibility of the witnesses, the court's comment violates due process. In *People v. Oliver* (1975) 46 Cal.App.3d 747 (*Oliver*), the defendant gave testimony denying his involvement in the charged offense, and he introduced supporting testimony from several witnesses. (*Id.* at p. 750.) In the presence of the jury, the trial court attacked the credibility of the defense witnesses including the defendant by stating, "I have never in my experience as a lawyer and a judge seen an array of witnesses whose credibility is so doubtful." (*Ibid.*) The Court of Appeal held that because the entire case hinged upon the credibility of the witnesses, the trial court's comment was tantamount to a directed verdict of guilty. (*Id.* at p. 753.) The Court of Appeal held this was a violation of the defendant's constitutional due process rights. (*Id.* at p. 751.)

Here, the trial court's comment was not an express statement about a witness's credibility, but it implicitly corroborated C.D.'s credibility in no uncertain terms. And as set forth below, it pertained to a particularly persuasive aspect of her testimony. The Attorney General does not defend the trial court's statement as proper, and while he describes it as ambiguous, he offers no neutral interpretation. The primary issue is the extent to which the comment prejudiced Deltoro.

### 4. *Forfeiture*

The Attorney General argues the claim is forfeited by defense counsel's failure to object. Deltoro argues the claim is not forfeited because any objection would have been futile. (See *Abel*, *supra*, 53 Cal.4th at p. 914 [claim is not forfeited for review if an objection would have been futile or could not have cured the prejudice].) Deltoro points

47

out that when defense counsel objected to the court's statements during voir dire, the court treated the objections with apparent hostility. The first time defense counsel objected, the court acknowledged the objection but declined to rule on it and instead continued its discussion of the single-witness rule. When defense counsel objected a second time in response to the court's previewing the prosecution evidence, the court asked her for a basis and she offered to argue it in limine. Again, the court did not rule on the objection or pause for a sidebar, and the court continued with its voir dire. The next day, the court took up the objections outside the presence of the jury. Defense counsel argued that the court in voir dire was essentially "pretrying" the case to the jury and that the court's statements "went past what is allowable or appropriate in voir dire." In response, the court overruled the objections and warned defense counsel "that it is a violation of the Rules of Professional Conduct, as well as reportable conduct, to say that a judge is inappropriate, especially when saying it in front of her client and her client's wife." Deltoro argues this shows an objection to the court's "traumatized" comment would have been futile because the court would have overruled it and defense counsel reasonably feared the court would reprimand her.

Given the court's comments to defense counsel, she may have declined to object because she feared doing so would make things worse. She might also have calculated that there was a good chance the "traumatized" comment did not fully register with every juror, and that seeking an admonition or clarification from the court would make it abundantly clear to all of them what the court had said. Counsel may have believed that a clarification or admonition from the court would not be sufficient to erase the prejudicial impact of the court's comment, such that highlighting it threatened to make things even worse. We recognize that the court's comment placed defense counsel on the horns of a dilemma. The court could have instructed the jury to disregard what it had just said, but the comment appeared to be made in all candor, and it is reasonable to wonder whether some jurors would find it impossible to ignore based on a formalistic admonition. We

48

generally presume a court's admonitions can sufficiently allow jurors to "unring the bell" but there are practical limits to this presumption. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1244 (*Sturm*) [it was highly improbable that admonishment could cure judicial misconduct]; *People v. Hill* (1998) 17 Cal.4th 800, 845-846 [court's admonitions and sustaining of defendant's objections were insufficient to cure the prejudice of prosecutorial misconduct because one cannot "unring a bell"]; *People v. Santana* (2000) 80 Cal.App.4th 1194, 1207 [repeated admonition could not cure the impression given to the jury that the trial judge found the defense case to be weak].) Under these circumstances, we find the claim is not forfeited.

But even assuming the prejudice could have been cured by admonition such that defense counsel should have objected, the forfeiture doctrine does not prohibit us from reviewing this issue. "An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party." (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [except for claims involving the admission or exclusion of evidence, appellate courts may raise an unpreserved issue on review].) "Whether or not it should do so is entrusted to its discretion." (*Ibid.*) (See *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 649 [forfeiture by a party's failure to raise an issue below does preclude an appellate court from considering the issue], citing 6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Reversible Error, § 36, p. 497.) Because the error in question implicated Deltoro's constitutional fair trial rights, we exercise our discretion to review it. (See *Abbaszadeh,* at p. 648 [exercising discretion to review merits of claim where the error rendered the trial unfair].)

### 5. *Prejudice*

The Attorney General argues there was no prejudice because "there is no basis to conclude that the jury thought that the court was doing anything other than describing what was readily apparent from the witness's demeanor." We cannot discern from the bare transcript how the jury might have perceived C.D.'s demeanor. But even assuming

49

she displayed severe trauma, the court's comment had another pernicious effect: Because the court made the comment early in the prosecution's case, the comment encouraged the jury to prejudge the matter before all the evidence had been presented. This threatened to undercut Deltoro's right to a presumption of innocence in violation of his constitutional fair trial rights.

"The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." (*Estelle v. Williams* (1976) 425 U.S. 501, 503.) "To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process." (*Ibid.*) The law requires jurors to maintain the presumption of innocence and impartially consider *all* the evidence received throughout the trial before deciding on a verdict. (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159.) "The presumption of innocence continues during the taking of testimony and during jury deliberations until the jury reaches a verdict. [Citation.] It is misconduct to misinform the jury that the presumption of innocence is 'gone' prior to the jury's deliberations. It strikes at the very heart of our system of criminal justice." (*Ibid.*)

The timing of the trial court's comment exacerbated its prejudicial impact. By making a comment that implied Deltoro was guilty before he had a chance to testify, the court violated his constitutional right to have the jury receive his testimony impartially under the presumption of innocence. "It is important that hostile comment of the judge should not render vain the privilege of the accused to testify in his own behalf." (*Quercia*, *supra*, 289 U.S. at p. 470.) The Attorney General's assertion—that the court was simply stating what was apparent to the jury—misses the point. The jury had a duty to remain impartial, but the court's comment made it more likely the jury would view Deltoro's testimony with a jaundiced eye. And just as we cannot observe C.D.'s demeanor from the bare transcript, we cannot say whether Deltoro testified to his

innocence with such a degree of sincerity that a jury free of improper influence could have found it constituted reasonable doubt.

The Attorney General argues the court's statement was "fleeting and isolated" and therefore could not be prejudicial as a matter of law. The Attorney General cites several cases for this proposition. (See *Seumanu*, *supra*, 61 Cal.4th at pp. 1320-1321; *People v. Geier* (2007) 41 Cal.4th 555, 614 (*Geier*), overruled on other grounds in *Melendez–Diaz v. Massachusetts* (2009) 557 U.S. 305; *People v. Melton* (1988) 44 Cal.3d 713, 753-754 (*Melton*).) In *Seumanu*, the prosecutor was examining an evasive witness—a witness called by the prosecution, not the defendant—and asked an argumentative question to which defense counsel objected. In sustaining the objection, the trial court commented to the prosecutor, "*I know the temptation*, but sustained." (*Seumanu*, at p. 1320.) The California Supreme Court held this was not judicial misconduct. "Not only was the comment solitary and fleeting, it was also ambiguous in that it may reasonably have been understood by the jury not as an expression of where the court's sympathies secretly lay, but as merely a polite reminder to the prosecutor, *upon sustaining the defense objection*, to maintain her composure in the face of a recalcitrant and combative witness." (*Id.* at pp. 1320-1321.)

In *Geier*, the defendant argued the trial court made inappropriate jokes during the guilt phase of his capital trial and other comments that undercut the credibility of his mitigation witnesses in the penalty phase. (*Geier*, *supra*, 41 Cal.4th at p. 611.) In one comment during the guilt phase, the court made a joke about whether anyone wanted a manicure from a prosecution witness, who was a manicurist. Similarly, the court made several other irrelevant jokes at the expense of prosecution witnesses. (*Id.* at pp. 611-612.) Defendant also complained about comments the trial court made during a pause in the trial for Law Day. The court stated, "[T]his is a country that is based on law and order and we have many rights to be thankful for," to which the court added that the jury had been exposed to these principles for months. (*Id.* at p. 612.) As part of this speech,

51

the court also referenced the bombing of the federal building in Oklahoma that had just happened, adding that "hopefully the people responsible will be brought to justice, but they will enjoy the rights that all people have under our Constitution when they are apprehended and brought to trial." (*Ibid.*)

Geier also raised claims of misconduct based on two jokes the court made in response to testimony by two defense witnesses during the penalty phase. When the prosecution cross-examined one of the witnesses about parties he and the defendant had attended in fields during their high school years, the court asked in joking fashion whether Forrest Gump was present. (*Geier, supra,* 41 Cal.4th at p. 612.) When another witness testified about her complicated personal life, the court asked whether she had ever appeared on *Oprah*. (*Ibid.*) Finally, at the conclusion of the penalty phase, the trial court complimented the lawyers for their civility in contrast to "the theatrical inclinations of the participants" in the trial of O.J. Simpson, which was underway at the time. (*Id.* at pp. 612-613.) The court then asked the jurors to give the lawyers "a round of applause." (*Id.* at p. 613.)

The California Supreme Court held that the "fleeting remarks" the trial court made during the guilt phase were innocuous and did not constitute judicial misconduct. (*Geier, supra,* 41 Cal.4th at p. 614.) The Supreme Court also found nothing harmful about the trial court's remarks during Law Day or the compliments about the civility displayed by the trial attorneys. (*Ibid.*) The Court held that "[n]one of these comments had any tendency to bolster the prosecution or denigrate the defense." (*Ibid.*) As to the jokes at the expense of the defense's mitigation witnesses during the penalty phase, the Court held they were improper because they could have been perceived by the jury as derogatory comments about the witnesses' credibility. But the Court concluded that "these brief, isolated comments 'fall short of the intemperate or biased judicial conduct which warrants reversal.' [Citation.]" (*Ibid.*)

In *Melton*, the California Supreme Court considered another instance of two jokes made by a trial court in the penalty phase of a capital case. First, the trial court asked a defense witness named Dr. Podboy if the court could call him "John Boy for short." (*Melton*, *supra*, 44 Cal.3d at p. 753.) Second, when a clinical psychiatrist for the defense testified about a person's capacity to carry out an act of violence, the trial court jokingly granted the witness "permission" to shoot a public defender. (*Ibid.*) Defense counsel (who was not the public defender) joined in the joke by adding, "That might be justified." (*Ibid.*) The California Supreme Court stated that it did not condone the reference to shooting a public defender, but finding the remarks "brief and mild," the Court held, "These isolated instances, while unfortunate, fall short of the intemperate or biased judicial conduct which warrants reversal." (*Id.* at p. 754.)

We do not read these cases as setting forth a rule that a single instance of misconduct cannot be prejudicial. Under the applicable standard of review, we must evaluate prejudice on a case-by-case basis. (*Abel, supra*, 53 Cal.4th at p. 914.) The cases cited by the Attorney General involved remarks by a trial court that were largely irrelevant to the central issues of guilt or penalty. At most, the statements made by the judges in those cases carried a speculative potential to affect the credibility of a witness. None of the cases cited by the Attorney General concerned a statement by the trial court that implied the defendant was guilty. In this case, the obvious implication of describing C.D. as "traumatized" is that she was traumatized because Deltoro had molested her.

While there is no indication that the court made the remark with the intent to influence the jury, the comment created an unacceptable danger of biasing the jurors' perception of the witnesses' credibility and affecting the outcome of the case. The prosecution's case hinged on the credibility of the complaining witnesses' testimony over the credibility of Deltoro, who unequivocally denied the allegations. In the absence of any physical evidence, the jury's capacity to evaluate C.D.'s demeanor impartially was critical to the fairness of the outcome.

53

It is obvious that a display of painful emotion by a witness carries enormous persuasive potential, particularly in the context of a sexual assault trial. And the prosecutor relied on this by making trauma the theme of his closing argument, which began as follows: "Childhood memories are supposed to be happy, looked back on fondly. For [C.D.] and [A.D.], these childhood memories are full of *trauma*. *Trauma that we witnessed* still lives with them to this day." (Italics added.) The prosecutor's subsequent description of C.D.'s testimony repeatedly and specifically referred to examples of her emotional demeanor on the stand. There is no indication the prosecutor was intentionally or knowingly exploiting the court's comment, and we do not infer or imply any impropriety in this argument. It was entirely appropriate for the jury to consider C.D.'s demeanor on this stand in evaluating her credibility. (*People v. Garton* (2018) 4 Cal.5th 485, 501 [a jury may consider a witness's demeanor while testifying to determine the witness's credibility].) But it was precisely the persuasive power of that testimony that made it essential to a fair outcome for the jury to receive it impartially.

The Attorney General argues that the court merely made the comment in connection with disinfecting the witness stand after C.D. had left in keeping with COVID-19 protocols in effect at the time. This context does not mean the jury ignored or remained uninfluenced by the "traumatized" comment. To the contrary, the subtle nature of the comment may have had a more insidious effect than the express statement in *Oliver*, wherein the trial court made its bias obvious by announcing it outright. (*Oliver, supra,* 46 Cal.App.3d at p. 750 ["I have never in my experience as a lawyer and a judge seen an array of witnesses whose credibility is so doubtful."]) The jurors in *Oliver* were made abundantly aware of the court's bias, and they could consciously account for it if they chose to. Such explicit statements are still improper, but subtle expressions of bias can have a more pernicious effect precisely because jurors may not be consciously aware of them.

54

Courts have long recognized that jurors are easily influenced by a judge's remarks, even when they are subtle. "It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his [or her] lightest word or intimation is received with deference, and may prove controlling. [Citation.]" (*Starr v. U.S.* (1894) 153 U.S. 614, 626.) "Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials." (*Sturm*, *supra*, 37 Cal.4th at p. 1233.) "[J]urors watch courts closely, and place great reliance on what a trial judge says and does. They are quick to perceive a leaning of the court. Every remark dropped by the judge, every act done by him during the progress of the trial is the subject of comment and conclusion by the jurors, and invariably they will arrive at a conclusion based thereon as to what the court thinks about the case." (*People v. Zammora* (1944) 66 Cal.App.2d 166, 210.) Accordingly, "Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' [Citation.]" (*Sturm,* at pp. 1237-1238, quoting *Zammora*, at p. 210.) The trial court here failed to adhere to this admonition.

The Attorney General argues that the jury instructions cured any prejudice because the court instructed the jury, based on CALCRIM No. 3550, "Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." The trial court first gave this instruction in preliminary admonitions when the jury was empaneled, and then once again just before the jury began deliberating. Although we generally presume the jury adheres to such instructions, this presumption is not absolute. (See *Sturm*, *supra*, 37 Cal.4th at p. 1244 [highly improbable that admonishment not to infer bias on the part of the court was effective]; *People v. Burns* (1952) 109 Cal.App.2d 524, 542 [court's admonishments not to draw conclusions as to guilt or innocence from the court's remarks could not overcome the evident attitude of the judge throughout the trial].) The circumstances here cast doubt on

55

the effectiveness of the instructions. The first time the jury heard the instruction was on March 12, 2020, just prior to the break in the proceedings caused by COVID-19. The court made the improper "traumatized" comment on June 23, 2020—more than three months later—when C.D. had returned for further testimony following the break. The passage of time, together with the offhandedly subtle manner in which the court made the comment, made it less likely jurors would actually recall the instruction and consciously apply it to the court's comment. And as explained in section II.F below, the court had made statements in voir dire that effectively predisposed the jury to credit the testimony of the complaining witnesses. In the context of this trial, the presumption that the instruction would cure the harm is no longer persuasive. As to the second time the jury heard the admonition, the court gave it just before the jury began deliberating—after closing arguments, and long after Deltoro and his brother had testified. Because the court's improper comment had diminished Deltoro's right to an impartial jury before the jury received his testimony or heard closing arguments, the second instance of the instruction came too late to cure the harm.

Furthermore, the Attorney General's characterization of the comment as "isolated" ignores the court's previous statements. Under the proper standard of review, we must consider not only the content of the improper statement in isolation, but the context of the statement and the circumstances under which it was made. (*Abel*, *supra*, 53 Cal.4th at p. 914.) The context and circumstances here include the extended statements the court made during voir dire, set forth in detail in section II.F above. We consider this overall context in section H below, which addresses the cumulative prejudicial effect of these errors.

## H. *Cumulative Prejudice of Multiple Errors*

We conclude above that multiple errors occurred during Deltoro's trial: The prosecutor misused CSAAS evidence in closing argument; the verdict forms erroneously stated that a lewd act on a child was punishable as a misdemeanor; the trial court made

56

improper statements in its voir dire of potential jurors; and the trial court described a complaining witness as "traumatized" at the conclusion of her testimony. Any of these errors would not require reversal occurring in isolation, but at least three of these errors had the potential to cumulatively prejudice Deltoro because they tended to reinforce the impact on the jury along a common dimension: they improperly bolstered the credibility of the complaining witnesses' testimony.

In voir dire, the trial court made numerous statements about the single-witness rule as applied to a victim's testimony, and the court posed hypotheticals intended to ferret out any prospective jurors who might not convict Deltoro in the absence of corroborating evidence. The court also made statements previewing the complaining witnesses' testimony in this case while suggesting there would be no testimony from defense witnesses. While the court's statements of law were not inaccurate, the court's presentation and hypothetical examples in this portion of voir dire placed an undue emphasis on the evidentiary value of the complaining witnesses' testimony over the testimony of the defense witnesses. The effect was to predispose jurors to credit the complaining witnesses without due consideration for conflicting evidence.

The court's statements in voir dire exacerbated the prejudicial potential of the court's subsequent improper comment. The "traumatized" comment, by bolstering C.D.'s credibility and implying Deltoro was guilty of her allegations, encouraged the jury to prejudge the relevant charges before Deltoro or his brother had testified. And as detailed in section II.F, the court's statements in voir dire emphasized the evidentiary significance of the complaining witnesses' testimony while ignoring the significance of defense testimony. As a result, the court's statements in voir dire effectively primed the jury to prematurely disregard or discredit the relevant portions of Deltoro's testimony. While a trial court has the discretion to summarize the evidence at any time, including voir dire, the court must do so in a way that is " 'accurate, temperate, nonargumentative, and scrupulously fair.' " (*People v. Sorrels* (2012) 208 Cal.App.4th 1155, 1165.) Here,

57

the court's unbalanced hypotheticals and previews of the evidence during voir dire enhanced the potential for the court's subsequent "traumatized" comment to bias the jury.

The prosecutor's misuse of CSAAS evidence also tended to improperly bolster the credibility of the complaining witnesses' testimony. The prosecutor referred to multiple instances of their testimony and matched these instances with several of the CSAAS components described in the expert's testimony. In the context of the overall argument, the prosecutor's use of this evidence implied the similarities between the events in the victims' testimony and the CSAAS components meant the victims' allegations of molestation were true. While a jury may use CSAAS evidence in evaluating the credibility of a witness's testimony insofar as the behavior identified in CSAAS components is not inconsistent with being molested, the prosecutor may not imply that the CSAAS evidence shows the victim testified truthfully about being molested. By doing the latter, the prosecutor here improperly used CSAAS evidence to bolster the credibility of the complaining witnesses' allegations against Deltoro.

Deltoro argues the trial court's misstatements violated his federal due process rights to an impartial judge and the right to have a jury determine all factual issues relating to a charged offense. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278; *In re Winship* (1970) 397 U.S. 358, 364.) The Attorney General argues the errors should be evaluated under the state law standard for prejudice as set forth in *Watson*, *supra*.

One of the errors involved prosecutorial misstatements, and two of the errors involved judicial misstatements. Over the past two decades, the California Supreme Court has applied multiple prejudice standards to claims of judicial misconduct. In numerous cases, the Court has simply asked whether the trial court's behavior was so prejudicial that it denied a fair, as opposed to a perfect, trial. (*People v. Silveria* (2020) 10 Cal.5th 195, 321 (*Silveria*); *People v. Maciel* (2013) 57 Cal.4th 482, 533; *People v. McWhorter* (2009) 47 Cal.4th 318, 373; *Abel*, *supra*, 53 Cal.4th at p. 914; *People v.*

58

*Guerra* (2006) 37 Cal.4th 1067, 1112, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *Snow*, *supra*, 30 Cal.4th at p. 78.)

By contrast, in *People v. Cook* (2006) 39 Cal.4th 566 (*Cook II*), the California Supreme Court applied the *Chapman* standard to a misconduct claim involving a trial court's questioning of witnesses. (*Id.* at p. 599.) In other cases, the California Supreme Court has considered both *Watson* and *Chapman* in evaluating prejudice. In *People v. Nieves* (2021) 11 Cal.5th 404 (*Nieves*), the Court held judicial misconduct in the guilt phase of a capital trial was harmless under either *Watson* or *Chapman*, without deciding which standard applied. (*Cook II,* at pp. 502-503.) The Supreme Court took the same approach to claims of judicial misconduct at the penalty phase in *Sturm*, *supra*, 37 Cal.4th at p. 1244 [reversing judgment of death under either *Watson* or *Chapman*]. The *Nieves* Court observed that to the extent claims of judicial misconduct are rooted in the California Constitution, e.g., disparagement of defense counsel and witnesses, or improper questioning of witnesses, the *Watson* standard applies. (*Cook II,* at p. 502 [citing *People v. Mahoney* (1927) 201 Cal. 618, 626].) Consistent with this principle, the Court has applied *Watson* to claims of improper questioning of witnesses in the guilt phase of a capital trial. (*People v. Harris* (2005) 37 Cal.4th 310, 350-351.)

None of these cases concerned a trial court making a statement during the presentation of evidence that implied the defendant's guilt. A number of older cases considered trial courts' comments to deliberating or deadlocked juries in which the court implied the defendant was guilty or stated its opinion on guilt. In *Cook I, supra*, a trial court made statements to a deadlocked jury in which the court evaluated witnesses' credibility and opined that the defendant was guilty. (*Cook I, supra*, 33 Cal.3d at p. 406.) The California Supreme Court treated this as a violation of the state constitutional right to

59

a jury trial and held reversal was mandatory.[8] (*Id.* at p. 412.) (See also *People v. Moore* (1974) 40 Cal.App.3d 56, 67 [mandatory reversal due to trial court's improper statements to a deliberating jury].) By contrast, in *People v. Flores* (1971) 17 Cal.App.3d 579, a Court of Appeal applied the *Watson* prejudice standard to similar comments by a judge to a deadlocked jury. (*Id.* at p. 588.)

As explained above, here the court's comment improperly bolstered C.D.'s credibility and implied Deltoro was guilty of her allegations, but the improper influence of the statement was not limited to the jury's deliberations. The court made this comment early in the presentation of evidence, undercutting the jury's ability to maintain the presumption of innocence for the remainder of the trial. Because the federal Constitution guarantees the right to have determinative issues of fact decided by an impartial jury hearing the evidence under the presumption of innocence, the potential effect of this error implies we should analyze prejudice under the *Chapman* standard.

The trial court's statements and the prosecutor's improper argument may also be evaluated under a "fair trial" standard. (*Silveria*, *supra*, 10 Cal.5th at p. 321 [considering whether trial court's behavior was so prejudicial that it denied defendant a fair, as opposed to perfect, trial]; *Cole*, *supra*, 33 Cal.4th at p. 1202 [prosecutorial misconduct that would violate federal due process rights must be of sufficient significance to result in the denial of the defendant's right to a fair trial].) As applied to prosecutorial misconduct, this is a federal standard.

Given the mix of errors here, we conclude the proper standard for prejudice is supplied by *Chapman*. In this context, that standard places the burden on the Attorney General to show beyond a reasonable doubt that the error did not contribute to the verdict. (*People v. Pearson* (2013) 56 Cal.4th 393, 463.) " ' "To say that an error did not

---

[8] The California Supreme Court subsequently overruled *Cook I* to the extent it forbade all judicial comment on the evidence to a deadlocked jury. (*Rodriguez supra*, 42 Cal.3d at p. 770.)

contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.]  Thus, the focus is on what the jury actually decided and whether the error might have tainted its decision.  That is to say, the issue is "whether the . . . verdict actually rendered in this trial was surely unattributable to the error."  [Citation.]' [Citation.]"  (*Ibid.*)  The Attorney General has not met this burden.

In summary, while the improper use of CSAAS evidence and the "traumatized" comment would not have required reversal had those errors occurred in isolation, the trial court's statements in voir dire magnified the effect of those combined errors.  Not only were jurors predisposed to credit the complaining witnesses' testimony from the start, the statements primed jurors for the prejudicial effect of the subsequent errors because the later errors likewise tended to bolster the complaining witnesses' credibility.  Given that the prosecution's case depended heavily on the complaining witnesses' testimony, the net effect of the errors readily may have influenced the outcome.

Furthermore, the prosecution's evidence was not so overwhelming that it would have rendered the errors harmless.  When we consider whether overwhelming evidence rendered an error harmless, we do not simply weigh the strength of each party's case against the other's.  (See *Neder v U.S.* (1999) 527 U.S. 1, 19 [a reviewing court making this harmless-error inquiry does not become in effect a second jury to determine whether the defendant is guilty].)  The central evidence in the prosecution's case consisted of the testimony of the complaining witnesses, and Deltoro denied the allegations categorically in his testimony.  Testimony from the friends and parents of the two girls showed they had made "fresh complaint" disclosures in the past, but the content of the disclosures was not adduced, and this testimony was not admissible to prove the truth of the disclosures. None of the disclosures supplied sufficient evidence to prove all the elements of the charged offenses.  Viewing the evidence in its entirety, a rational juror could have found a reasonable doubt as to all charges—for example, if the juror found Deltoro's testimony

grounds for reasonable doubt. (Cf. *Pope v. Illinois* (1987) 481 U.S. 497, 503 [error would be harmless if no rational juror could fail to find the element that was the subject of an erroneous instruction].) On this record, the errors cannot be considered harmless in relation to overwhelming evidence.

For all the reasons above, we cannot conclude beyond a reasonable doubt that the effect of the errors did not contribute to the verdict. For the same reasons, reversal would be required under the "fair trial" standard. (*Silveria*, *supra*, 10 Cal.5th at p. 321 [considering whether trial court's behavior was so prejudicial that it denied defendant a fair, as opposed to a perfect, trial].)

### III.   DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for further proceedings.

_____

Greenwood, P. J.


WE CONCUR:


_____

Grover, J.


_____

Lie, J.


People v. Deltoro
H048311